No. 21-1697

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

JERRY DAVIDSON, individually and on behalf of others similarly situated,

       Plaintiff-Appellant,

  vs.

UNITED AUTO CREDIT CORPORATION, a California Corporation,

       Defendant-Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, The Hon. Leonie M. Brinkema
Case No. 1:20-cv-01263

---

**BRIEF OF THE AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER BANKERS ASSOCIATION, GUARANTEED ASSET PROTECTION ALLIANCE, NATIONAL AUTOMOBILE DEALERS ASSOCIATION, CONSUMER CREDIT INDUSTRY ASSOCIATION, AND CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE AND IN SUPPORT OF AFFIRMANCE**

Marci V. Kawski
HUSCH BLACKWELL LLP
P.O. Box 1379
33 East Main Street, Suite 300
Madison, WI 53701-1379
608-255-4440
608-258-7138 (fax)
marci.kawski@huschblackwell.com

Lisa M. Lawless
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202-3819
414-273-2100
414-223-5000 fax

lisa.lawless@huschblackwell.com

Attorneys for *Amici Curiae* the American Financial Services Association, Consumer Bankers Association, Guaranteed Asset Protection Alliance, National Automobile Dealers Association, Consumer Credit Industry Association, and Chamber of Commerce of the United States of America

## <u>LOCAL RULE 26.1 DISCLOSURE STATEMENT</u>

Corporate disclosure information for each of the *amici curiae* is

located in the addendum at the end of this brief.

# TABLE OF CONTENTS

**Page**

LOCAL RULE 26.1 DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES .............................................................iv

INTEREST OF *AMICI CURIAE* ...................................................1

    1.    Identity of the *Amici Curiae* and Their Interest in the Case ................................................................................2

    2.    Authority to File *Amicus Curiae* Brief; Author and Funding of Brief ...........................................................5

ARGUMENT ....................................................................................5

I.    The RIC Was a Loan Offered for the Express Purpose of Financing the Purchase of the Vehicle. .................................8

    A.    "Express Purpose of Financing the Purchase" ...........8

II.    The MLA's History and Purpose .......................................11

III.    Purchase Money Auto Loans That Finance GAP Waivers, Processing Fees, and Prepaid Interest Are Not the Type That Congress Intended to Regulate in the MLA. ......................14

IV.    Interpretive Guidance Does Not Affect the Analysis. ........21

    A.    Interpretive Rules May be Disregarded and Given No Weight. ..............................................................22

    B.    DoD is Not an Expert in Financial Matters. ............24

    C.    The 2016 Guidance ................................................25

    D.    The 2017 Guidance ................................................26

CONCLUSION ..............................................................................28

CERTIFICATE OF COMPLIANCE ...............................................29

CERTIFICATE OF SERVICE ......................................................................30

ADDENDUM ...........................................................................................31

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
   982 F.3d 258 (4th Cir. 2020)................................................................ 23, 24

*Chen Zhou Chai v. Carroll*,
   48 F.3d 1331 (4th Cir. 1995)......................................................................22

*Children's Hosp. of the King's Daughters, Inc. v. Azar*,
   896 F.3d 615 (4th Cir. 2018)......................................................................22

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
   874 F.2d 205 (4th Cir. 1989)......................................................................22

*Mining Energy, Inc. v. Dir., Off. Of Workers' Comp. Programs*,
   391 F.3d 571 (4th Cir. 2004)......................................................................23

*Nahigian v. Juno-Loudoun, LLC*,
   677 F.3d 579 (4th Cir. 2012)......................................................................24

*Romero v. Barr*,
   937 F.3d 282 (4th Cir. 2019)......................................................................24

*Sayyed v. Wolpoff & Abramson*,
   485 F.3d 226 (4th Cir. 2007).......................................................................8

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   909 F.3d 635 (4th Cir. 2018)......................................................................24

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................ 23, 24

*U.S. Dep't of Lab. v. N. Carolina Growers Ass'n*,
   377 F.3d 345 (4th Cir. 2004)......................................................................23

*United States v. Williams*,
   364 F.3d 556 (4th Cir. 2004).......................................................................8

iv

*Walton v. Greenbrier Ford, Inc.*,
    370 F.3d 446 (4th Cir. 2004) ...................................................................22

**Statutes**

10 U.S.C. § 987(i)(6) ........................................................... 1, 5, 8, 25, 27

12 U.S.C. § 347 .......................................................................................10

42 U.S.C. § 1490d ...................................................................................10

42 U.S.C. § 292d .....................................................................................10

42 U.S.C. § 8833 .....................................................................................10

5 U.S.C. § 553(a)-(c) ...............................................................................22

7 U.S.C. § 1929 .......................................................................................10

**Rules**

Fed. R. App. P. 29 .....................................................................................5

Fed. R. App. P. 32 ...................................................................................29

Local Rule 26.1 .......................................................................................... i

Local Rule 29 ............................................................................................5

**Regulations**

12 CFR § 1041.3(d) .................................................................................10

32 CFR § 232.3(b)(1) ..............................................................................12

32 CFR § 232.3(f)(1) ...............................................................................13

32 CFR § 232.3(f)(2)(ii) .............................................................................1

32 CFR § 232.3(f)(2)(iii) .........................................................................25

32 CFR § 232.8(f) .............................................................................. 18, 19

72 Fed. Reg. 18157 (4/11/2007) ....................................................................12

72 Fed. Reg. 18159 (4/11/2007) ....................................................................12

79 Fed. Reg. 58602 (9/29/2014) ....................................................................13

79 Fed. Reg. 58608 (9/29/2014) ....................................................................13

79 Fed. Reg. 58609 (9/29/2014) ....................................................................13

81 Fed. Reg. 58840-01 ....................................................................................25

82 Fed. Reg. 58739-01 (12/14/2017) ...........................................................26

85 Fed. Reg. 11842-02 (2/28/2020) ..............................................................26

## **Additional Authorities**

Black's Law Dictionary (11th ed. 2019) ..........................................................9

Consumer Credit Industry Association, CFPB OSA 6th Annual
    Servicemember Report (Feb. 2019) ...........................................................17

DoD, Report on Predatory Lending Practices Directed at Members
    of the Armed Forces and Their Dependents (8/9/2006) ................... 11, 14

Durkin, et. al., "Consumers and Guaranteed Asset Protection
    ('GAP Protection') on Vehicle Loans and Sales-Financing
    Contracts: A First Look" (9/29/2021) .................................... 15, 16, 17, 18

Experian Information Solutions, Inc., "Auto Finance Insights[:]
    State of the Automotive Finance Market Q3 2021 ............................ 14, 15

https://www.defense.gov/About/ ...................................................................24

https://www.merriam-webster.com/dictionary/express...................................9

NADA letter to DoD (10/12/2018).................................................................17

NADA letter to DoD (2/6/2019)...................................................... 14, 19, 20

NADA letter to DoD (8/12/2019)..................................................................20

Petraeus Before the U.S. Senate Committee on Commerce, Science
    & Transportation (11/20/2013),
    https://www.consumerfinance.gov/about-us/newsroom/hollister-
    k-petraeus-before-the-u-s-senate-committee-on-commerce-
    science-transportation ............................................................................13

Testimony of Hollister K. Petraeus Before the Senate Committee
    on Veterans' Affairs 1 (7/31/2013),
    https://www.consumerfinance.gov/about-us/newsroom/hollister-
    k-petraeus-before-the-senate-committee-on-veterans-affairs/...................11

## INTEREST OF *AMICI CURIAE*

Enacted 16 years ago, the Military Lending Act ("MLA") exempts purchase money auto loans from its coverage.  The MLA exempts "a loan procured in the course of purchasing a car" when "that loan is offered for the express purpose of financing the purchase" and "is secured by the car."  10 U.S.C. § 987(i)(6); Appellant's Statutory and Regulatory Addendum ["Stat.Reg.Add."] 6 (Doc.22-2).  Similarly, the implementing federal regulation exempts "[a]ny credit transaction that is expressly intended to finance the purchase of a motor vehicle when the credit is secured by the vehicle being purchased."  32 C.F.R. § 232.3(f)(2)(ii); Stat.Reg.Add.8.  (These are collectively referred to in this brief as the "auto loan exemption.")  Accordingly, for many years, purchase money auto loans have been offered to servicemembers in reliance on this exemption.  In these transactions, related items such as GAP waivers, processing fees, and prepaid interest have been financed in the transaction.

In this case, Appellant asks the Court to upend years of settled expectations and practice whereby optional GAP waivers are financed with and a part of the purchase money car loan.  Appellant would have the Court hold instead that if a purchase money auto loan finances GAP waiver in the contract, then by that fact the transaction loses the MLA auto loan exemption and thereby is subject to the MLA.  As shown in this brief, such a ruling would contradict the plain language of

the MLA, disregard the history and purpose of the MLA, and run contrary to the MLA's goal to ensure military readiness and its component, financial readiness.

### 1.    Identity of the *Amici Curiae* and Their Interest in the Case

As trade associations representing industry members involved in purchase money auto loans and the offering of guaranteed asset protection products, consumer asset and credit protection products, and other related products and services, the six *amici curiae* joining this brief have a strong interest in the issues presented by this case.

The *amici curiae* joining this brief are:

**The American Financial Services Association** ("AFSA") —  Founded in 1916, AFSA is the national trade association for the consumer credit industry, protecting access to credit and consumer choice.  AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.

**The Consumer Bankers Association** ("CBA") — The CBA is the only member-driven trade association focused exclusively on retail banking.  CBA members operate in all 50 states, serve more than 150 million Americans, and hold two thirds of the country's total depository assets.  CBA's associate members include the premier providers of goods and services to those institutions.

**The Guaranteed Asset Protection Alliance** ("GAPA") — Formed in 2006, the GAPA is comprised of companies experienced in offering quality guaranteed asset protection products throughout the U.S.  GAPA's members include insurance companies, lenders, and administrative services companies who, together, bring valuable products to market in a responsible and competitive way.

**The National Automobile Dealers Association** ("NADA") — Founded in 1917, NADA serves and represents franchised new car and truck dealers nationwide.  Its members sell new cars and trucks and related goods and services as authorized dealers of various motor vehicle manufacturers and distributors doing business in the U.S.  There are more than 18,000 franchised motor vehicle dealerships in the U.S.  Of those, more than 16,000 are members of NADA.

**The Consumer Credit Industry Association** ("CCIA") — CCIA was organized in 1951 to be the trade association of insurance companies underwriting consumer credit insurance products sold by lenders and assuring loan repayment in the event of debtor death or disability.  The scope of CCIA activity evolved as new insurance products were introduced to the marketplace such as credit property and credit unemployment insurance.  Consumer financial security is enhanced by preserving the availability, value, and integrity of these products offered by CCIA members such as credit insurance, debt protection, Guaranteed Asset Protection, and service contracts.

**The Chamber of Commerce of the United States of America** ("the Chamber") — The Chamber is the world's largest business federation. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than three million businesses and professional organizations of every size, in every industry sector, and from every region of the country.

Collectively, the foregoing *amici curiae* represent a wide cross-section of the industry offering purchase money auto loans and related products and services. The *amici curiae* and their members devote considerable time, energy, and resources to achieving compliance with the myriad statutes governing these transactions. In these compliance efforts and their day-to-day transactions with military servicemembers and their families, the *amici curiae* and their members rely on the plain language of the MLA and the auto loan exemption. If the Court were to adopt Appellant's arguments, it would preclude servicemembers from financing items like filing fees and negative equity that may be necessary for a servicemember to afford the vehicle and it would preclude servicemembers from financing valuable protections like GAP waiver and other related products that provide valuable protection from losses. It would also upend the settled expectations of industry members who have relied on the plain language of the MLA's exemptions. Such a holding would have a devastating effect on the

existing contracts of the *amici curiae*'s members and would seriously negatively affect the future business and transactions of the *amici curiae* and their members.

### 2. Authority to File *Amicus Curiae* Brief; Author and Funding of Brief

This *amicus curiae* brief is being submitted pursuant to Fed. R. App. P. 29 and Local Rule 29, and it is accompanied by a motion for leave.

No counsel for any party authored any part of this brief and no person other than these *amici curiae*, their members, or their counsel, made any monetary contribution to fund the preparation or submission of this brief.

### <u>ARGUMENT</u>

The district court correctly applied the MLA, determining under the statute's plain terms that Appellant's retail installment contract ("RIC") is "a loan[1] procured in the course of purchasing a car" (*i.e.*, a "purchase money auto loan") that was "offered for the express purpose of financing the purchase and is secured by the car." *See* 10 U.S.C. §987(i)(6). As such, the RIC falls outside the MLA's definition of "consumer credit." Purchase money auto loans that include financing of related items, such as optional GAP waivers, processing fees, and prepaid

---

[1] The statute uses the word "loan" and, therefore, we use that term throughout. However, a vehicle may be financed through a direct loan, in which the consumer receives money from a lender and pays it to a dealership to purchase the vehicle, or through indirect financing, in which the consumer buys the vehicle from the dealership on credit (*i.e.*, "credit sale") in a retail installment contract. In the latter transaction, the financing contract is typically later assigned to a finance company, bank, or credit union.

interest, likewise fall outside of the MLA because these items are inextricably bound with the RIC and would not have been purchased and financed but for the purchase of the car.

The MLA's plain language compels the conclusion that the RIC is not subject to the MLA. This is also supported by the MLA's history and policy purposes. Purchase money auto loans did not cause the problems that Congress sought to address in the MLA—*i.e.*, financial problems suffered by servicemembers when using certain loan products. To the contrary, GAP waivers provide servicemembers a valuable means to mitigate risk and avoid the devastating financial impact if the vehicle securing the loan is destroyed or stolen.

In this appeal, Appellant and the U.S. government *amici curiae* urge the Court to effectively re-write the MLA to exclude many auto loans from the MLA's auto loan exemption. This extraordinary leap must be rebuffed because it would violate the MLA's plain language, upend the industry's years of reliance and settled expectations, and have a drastic effect on the ability of servicemembers to purchase and finance vehicles.

The MLA does not apply to car loans, residential mortgages, or personal property loans. Congress concluded that these secured loans should not be subject to the MLA. So for 15 years, auto finance lenders have made loans to military servicemembers, relying on the MLA's auto loan exemption. Accepting

6

Appellant's policy arguments would ignore the will of Congress and preclude servicemembers from protections available to civilians. Many existing loans would be brought into the MLA, potentially leading to an increase in litigation and costs to businesses and consumers. The Court should decline to make policy and instead apply the statute as written.

To accept Appellant's arguments would require the Court to step into Congress's shoes and rewrite the statute. That is not the Court's role, and, moreover, it would be unfair and inequitable to all persons who entered into transactions for 15 years in reliance on the plain language of the MLA auto loan exemption. It is solely the role of Congress to enact statutory amendments, which would necessarily apply prospectively, not retroactively, and thus would not apply to purchase money auto loans executed before the amendments.

The Court also should decline the suggestion to rewrite the MLA based on interpretive rules adopted by the Department of Defense ("DoD"). Appellant erroneously relies on interpretive rules adopted by the DoD to argue that the GAP waiver and other items are not part of a loan for the express purpose of purchasing the car. The relevant DoD interpretive rule has been withdrawn. But even if it were still in effect, it would not be entitled to any deference because it conflicts with the statute's plain terms and is unpersuasive.

I.    **The RIC Was a Loan Offered for the Express Purpose of Financing the Purchase of the Vehicle.**

This case presents a straightforward question of statutory construction. When a statute's language is plain, the Court enforces it according to its terms, *Sayyed v. Wolpoff & Abramson,* 485 F.3d 226, 229–30 (4th Cir. 2007), giving "effect, if possible, to every word." *United States v. Williams,* 364 F.3d 556, 559 (4th Cir. 2004).

Here, the Court must determine whether the RIC is "a loan procured in the course of purchasing a car" when "that loan is offered for the express purpose of financing the purchase" and "is secured by the car." 10 U.S.C. § 987(i)(6).

A.    **"Express Purpose of Financing the Purchase"**

The auto loan exemption applies if "the loan" was "offered for the express purpose of financing the purchase" and was "secured by the car." The use of the term "loan" shows that it means the overall loan obligation set forth in the RIC, which the borrower agreed to repay in the installments stated in the contract. The RIC (and all amounts financed thereunder) is secured by the car.

"Express purpose" means the loan was to finance the auto purchase ("express" means stated explicitly, not by implication). "Express" means "directly, firmly, and explicitly stated // my *express* orders." "Express," https://www.merriam-webster.com/dictionary/express. It also means "of a particular sort : SPECIFIC // for that *express* purpose." (*Id.*) Another definition of

8

"express" is "[c]learly and unmistakably communicated; stated with directness and clarity." "Express," Black's Law Dictionary (11th ed. 2019). "Express" is the opposite of "implied." (*Id.*)

Here, the RIC was for the express purpose of financing the purchase of the vehicle. In the RIC, Appellant agreed to buy "the Property" from the dealership, subject to the RIC's terms. JA42. The RIC defines "Property" to mean "the Vehicle and all other property described in the *Description of Property* and *Additional Protections* sections." (*Id.*) The RIC gave the customer the opportunity "to purchase the Property and described services for the Cash Price or the Total Sales Price." JA42. The "Itemization of Amount Financed" included $94 paid to public officials, including filing fees, $250 for processing fees, and $395 for "GAP." JA41.

The RIC's express purpose was to finance the purchase of Appellant's motor vehicle. The loan's express purpose was not changed by including related items in the loan such as optional GAP or processing fees. It would be an absurd, tail-wagging-the-dog situation if a small related item financed under the RIC would alter the loan's express purpose. Had Congress wanted the auto loan exemption to apply only when the loan amount equaled the exact price of the vehicle (minus down payment) and not include any related items or fees, it would have used the

9

words "sole" or "only" instead of "express," or used other words to convey that intent. It did not do so.

Congress uses the terms "sole" and "express" to convey different meanings. Indeed, they have been used in the same statute. *See, e.g.*, 42 U.S.C. § 8833 ("any loan which is made solely to provide funds for …"; subrogation must be "expressly set forth in the loan guarantee"). When loans are to be made "solely" for a purpose, the statute says so. *See, e.g.*, 12 U.S.C. § 347 (" loans made <u>solely for the purpose of</u> …"); 42 U.S.C. § 292d (loan funds "shall <u>be used solely for</u> tuition, other reasonable educational expenses"); 42 U.S.C. § 1490d (funds and payments "<u>shall be used solely for</u> the acquisition of land"); 7 U.S.C. § 1929 ("a loan that <u>solely refinances a direct loan</u> …"). (All emphases added.)

Government regulators also know that "express" does not mean "sole." For example, close in time to when DoD revised the MLA's implementing rules, the Consumer Financial Protection Bureau ("CFPB"), an agency joining the government's *amicus curiae* brief, introduced (and later implemented) a regulation that excludes from its ambit credit "extended for the <u>sole and express purpose</u> of financing a consumer's initial purchase of a good when the credit is secured by the property . . . ." 12 CFR § 1041.3(d) (emphasis added).

10

Therefore, Appellant's RIC – which finances the vehicle purchase, GAP waiver, and other items – falls within the MLA's auto loan exemption because it is for the "express purpose" of financing the car purchase.

## II.    The MLA's History and Purpose

The MLA's purpose is to protect servicemembers from predatory lending, which "undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force."  DoD, Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents at p.9 (8/9/2006) ("2006 Report"),

https://apps.dtic.mil/sti/pdfs/ADA521462.pdf  (accessed 3/24/2022).  The 2006 Report identified certain loan products as "predatory lending":

- Payday and internet loans (*i.e.*, loans with triple digit interest rates and short minimum loan terms, which require rollover or back-to-back transactions);
- Car title loans ("loans secured by the title to vehicles <u>owned free and clear</u> by borrowers");
- Rent-to-own loans;
- Refund anticipation loans; and
- Military installment loans.

2006 Report at pp.10-22 (emphasis added).  These forms of credit were considered too risky and harmful to servicemembers.[2]

---

[2] Testimony of Hollister K. Petraeus Before the Senate Committee on Veterans' Affairs 1 (7/31/2013) (In the early 2000s, there was an "alarming increase in the number of businesses offering . . . 'payday loans,' and a corresponding increase in . . . servicemembers taking advantage of that easy money, often without the ability to repay . . . ."), at
(footnote continued)

In response, Congress enacted the MLA, and DoD promulgated rules,

making the MLA apply to three types of loans that undermined military readiness:

- Closed-end payday loans with terms of 91 days or fewer and amount financed $2,000 or less;
- Closed-end auto-title loans with terms of 181 days or fewer; and
- Closed-end tax refund anticipation loans.

32 CFR § 232.3(b)(1) (7/1/2008 ed.).

DoD commentary explained that those products represent two kinds of

financial problems for servicemembers and their families:  Those that contribute to

a cycle of debt (payday and vehicle title loans) and those that can cost the

servicemember high fees and interest costs (rent-to-own, installment loans, and

refund anticipation loans).  Cycle of debt was a more significant concern to DoD

than the high cost of credit.  Limitations on Terms of Consumer Credit Extended to

Service Members and Dependents, 72 Fed. Reg. 18157, 18159 (4/11/2007),

https://www.federalregister.gov/d/07-1780 (accessed 3/24/2022).

Five years into the MLA, policymakers concluded that the scope of covered

"consumer credit" was too narrow.  In their view, some creditors "creatively"

began offering products to escape the forbidden categories, but offered loans that,

---

https://www.consumerfinance.gov/about-us/newsroom/hollister-k-petraeus-before-the-senate-committee-on-veterans-affairs/ (accessed 3/24/2022).

in DoD's view, were like those products and carried the same risks and perceived predatory nature.[3]

In 2013, DoD proposed amendments to the definition of "consumer credit" in the regulations. Comments received by DoD in response to the proposed amendments asserted that "gaps in the definition of consumer credit" allow "predatory loan products at exorbitant triple digit effective interest rates . . . ." and that DoD should "not lose sight of [a] payday lender's demonstrated capacity for creative evasion." Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 79 Fed. Reg. 58602, 58608 & n.70, 58609 (9/29/2014), https://www.federalregister.gov/d/2014-22900 (accessed 3/24/2022).

In 2015, DoD adopted a broader definition of "consumer credit" to encompass those loans and to align with the Truth-in-Lending Act. 32 CFR § 232.3(f)(1) (7/1/2016 ed.). That definition remains today, 32 CFR § 232.3(f)(1) (2021).

---

[3] In testimony to Congress, Petraeus (then-CFPB Assistant Director, Office of Servicemember Affairs) said: "The increasing concern now is that lenders have easily found ways to get outside of the definitions in the DoD rule implementing the MLA." Petraeus Before the U.S. Senate Committee on Commerce, Science & Transportation (11/20/2013), https://www.consumerfinance.gov/about-us/newsroom/hollister-k-petraeus-before-the-u-s-senate-committee-on-commerce-science-transportation (accessed 3/24/2022).

III.    **Purchase Money Auto Loans That Finance GAP Waivers, Processing Fees, and Prepaid Interest Are Not the Type That Congress Intended to Regulate in the MLA.**

The MLA has always exempted residential mortgages, purchase money auto loans, and purchase money loans for personal property. These categories relate to necessities of life and it would harm servicemembers to limit these loans to them in these categories that are otherwise available in the marketplace.

Transportation presents a critical need for servicemembers. For example, as of November 30, 2018, servicemembers purchased on average 200,000 to 285,000 vehicles per year, buying vehicles every 4.5 to 6.5 years.[4] Loans to servicemembers to purchase vehicles have never been identified as predatory including in DoD's 2006 Report on predatory lending that gave rise to the enactment of the MLA. They do not carry anywhere near "300%" or "400%" annual percentage rates. *See* 2006 Report at pp.13, 16, 45. Nor are they short term. They do not trap servicemembers in a cycle of debt. According to a 2021 study by Experian on the "State of the Automotive Finance Market," the average loan term for a used car is between 60-64 months, with interest rates ranging from 3.68% for the most creditworthy consumers to 19.85% for much less creditworthy

---

[4] NADA letter to DoD, at p.4 n.8, p.8 (2/6/2019), available at: https://drive.google.com/file/d/1wZdv1QmQnxN-rhPJE4V32LqFC-QftZPc/view?usp=sharing

consumers.[5]  The average loan term for a new car is 63-72 months, with average interest rates ranging from 2.58% for the most creditworthy consumers to 12.99% for much less creditworthy consumers.[6]  Loans of this nature do not undermine military readiness.

Often when purchasing a vehicle, a servicemember voluntarily purchases and includes service contracts, GAP waivers, and other related items in the financing.  These items are commonly financed as part of the auto loan.  The servicemember may also want to finance negative equity from a trade-in.  The financing of these items does not convert the loan into the type of predatory loan targeted by the MLA.

GAP waivers give servicemembers a valuable benefit and have been offered by dealerships for at least 30 years.[7]  The value of optional GAP waivers was not questioned by DoD before the MLA was enacted and they were not an impetus for the law.  And, unlike the problems that DoD attempted to solve by amending the definition of consumer credit, the sale and financing of GAP is not used as a tool to

---

[5] Experian Information Solutions, Inc., "Auto Finance Insights[:] State of the Automotive Finance Market Q3 2021, at p.38, available at: https://drive.google.com/file/d/18QzC80S8qcvk7HLt7wrGXvM3Fpu7tl3R/view?usp=sharing

[6] (*Id.* at p.26)

[7] Durkin, et. al., "Consumers and Guaranteed Asset Protection ('GAP Protection') on Vehicle Loans and Sales-Financing Contracts:  A First Look," at p.17 (9/29/2021) ["GAP Study"], available at: https://drive.google.com/file/d/1T7f1TRAf_RLxwNwJCpxZvaxeDt_47_Hh/view?usp=sharing

circumvent the MLA.  Rather, the sale and financing of GAP waiver advances the goal of military readiness because in most cases it waives  servicemembers' debt if a theft or total loss of the vehicle occurs at a time when they owe more on their loan than auto insurance pays.

Contrary to Appellant's argument, GAP waivers are not "rife with 'abusive practice[s].'"  (App.22).  First, the cited Supervisory Highlights found just a few anecdotal situations where GAP waivers led to "an abusive practice."  Supervisory Highlights, Issue No. 19 (Summer 2019).  Second, the GAP Study, an academic analysis of consumer views of GAP waiver fielded by the highly regarded University of Michigan Survey Research Center and authored by a Federal Reserve Board Principal Economist, retired Federal Reserve Board Economist, and university professor in 2020, concluded that:

> [A]uto purchasers have realized the usefulness of GAP.  . . .  [M]ore than 90 percent of purchasers report the view that GAP purchase is a good idea, and more than 40 percent of nonpurchasers agree.  About nine tenths of GAP purchasers say they would purchase it again and would recommend purchase to friends and family members. Only about 1 percent of purchasers indicate dissatisfaction with their choice.

(GAP Study, *supra* page 15 n.7, at pp.17-18).  Moreover, in a 2019 study of the

1.219 million complaints made by consumers to the CFPB, only 39, or .0032% of

the total complaints, related to GAP and servicemembers.[8]

GAP waiver is offered by the dealership at the time of purchase.  It is

necessarily offered at the loan's inception, because it is a promise by the creditor to

waive the gap amount of the underlying loan under certain circumstances.[9]  It

cannot be purchased outside the transaction, and, because dealerships are not

licensed lenders,[10] GAP waivers cannot be offered by a dealership outside of the

loan, nor could a third party that is not a party to the finance agreement offer such

a waiver, because the waiver modifies a payment obligation owed to another

party.[11]

Although purchasers can make claims with their auto insurer if their vehicle

is declared a total loss, the payout from the insurer is limited to the vehicle's actual

---

[8] Consumer Credit Industry Association, CFPB OSA 6th Annual Servicemember Report, at p.1
(Feb. 2019), available at:  https://drive.google.com/file/d/14DRmHYKbz4bKrWX-
U2gYxdGLncWd9z_N/view?usp=sharing

[9] GAP insurance is different from GAP waiver.  GAP insurance typically is sold as an
endorsement to an auto insurance policy by an insurer.  NADA letter to DoD, at p.4
(10/12/2018), available at:
https://drive.google.com/file/d/16ZgLyp5xC97TlybZKbXMtcRTomo-
5Rmp/view?usp=sharing

GAP insurance's availability in the marketplace is far more limited than GAP waiver.  (*Id.*).
Moreover, many of the GAP insurance endorsements provide more limited coverage than the
coverage provided by GAP waiver.  (*Id.*).  Many of the largest U.S. insurers do not offer
GAP insurance.  (*Id.* at p.9).  Most people do not have access to GAP insurance and
customers cannot easily find GAP insurance for older vehicles.

[10] (*Id.*)

[11] (*Id.*)

17

cash value, minus deductibles. Because automobiles typically depreciate rapidly in the early years of ownership,[12] the gap between the insurance payout and the amount owed can be considerable. This amount is heightened when the customer has a high deductible on his auto insurance policy or has opted to include in the loan the amount owed (the lien balance) on a trade-in vehicle (*i.e.*, "negative equity").[13] GAP waiver typically makes a purchaser whole in this circumstance and, in the case of servicemembers, protects them from a significant and unexpected debt that could hurt military readiness.

If the Court determines that optional GAP waivers cannot be sold as part of a purchase money auto loan without being subject to the MLA, there will be adverse financial consequences for servicemembers. Should a purchase money auto loan be considered subject to the MLA, it is questionable whether a non-bank lender could secure the loan with the vehicle. The MLA "makes it unlawful for any creditor to extend consumer credit to a covered borrower with respect to which . . . [t]he creditor uses the title of a vehicle as security for the obligation involving the consumer credit, <u>provided however</u>, that for the purposes of this paragraph, the term 'creditor' does not include a person that is chartered or licensed under Federal or State law as a bank, savings association, or credit union." 32 CFR § 232.8(f)

---

[12] Gap Study, *supra* page 15 n.7, at pp.2, 5.
[13] (*Id.*)

(emphasis in original).  A business cannot viably extend credit for a consumer to purchase a vehicle without obtaining a proper security interest in that vehicle.  That is why many lenders and dealerships did not sell GAP waivers for 26 months after the 2017 DoD Guidance was adopted until it was withdrawn in 2020.  During that time, servicemembers were harmed.[14]  (As explained below, the 2017 Guidance opined that the sale of GAP made a purchase money auto loan subject to the MLA.)

For example, in the three years before the 2017 Guidance, one finance source took assignment of 1,554 auto loans with servicemembers where the vehicle was ultimately declared a total loss.  In 1,258 of these, or 81%, the servicemembers opted to purchase GAP waiver and later received GAP waiver benefits.  The average GAP waiver benefit for each of those exceeded $3,000 and the collective GAP benefits this group received exceeded $3.8 million.  During the same period, in the 19% where servicemembers decided not to purchase GAP waivers, they later owed on their auto loans nearly $2,400 per servicemember and $700,000 collectively.[15]

After the 2017 Guidance, the same finance source took assignment of 117 auto loans with active-duty servicemembers who were not offered GAP waiver

---

[14] NADA letter to DoD, at pp.2-4, 6-7 (2/6/2019).
[15] (*Id.* at pp.2-3)

because of the guidance and who had vehicles declared a total loss. This group owed on their auto loans approximately $2,800 per servicemember and $329,000 collectively.[16]

Other data that NADA provided in 2019 shows that since 2018, 310 servicemembers from a single finance source suffered a total loss of their vehicles without GAP waiver protection, and they owed $837,000 collectively.[17] As of February 2019, it was estimated the 2017 Guidance subjected about 5,000 military servicemembers who purchased and financed vehicles in 2018 through a single funding source to approximately $15 million in liability from total loss occurrences because they did not have GAP.[18]

These servicemembers then had to contend with two sources of vehicle-related debt: that related to the vehicle they no longer possess and that related to a replacement vehicle they must acquire to satisfy their transportation needs. This is a military readiness challenge that the MLA is designed to prevent. Prohibiting the sale of optional GAP and other related items in an auto loan undermines the purposes of the MLA.

---

[16] (*Id.* at p.3)
[17] NADA letter to DoD, at p.1 (8/12/2019), available at:
   https://drive.google.com/file/d/1wAwuYUVTC9OAQVd-BE9zQcd3LMuOfLTR/view?usp=sharing
[18] (*Id.* at 2)

If the auto loan exemption were construed as Appellant argues (App.28), servicemembers could finance no item besides the cost of the vehicle. It is common practice for servicemembers to finance not only the vehicle purchase price but also the amounts necessary to pay off the loan on their trade-in vehicle and to pay for items related to the vehicle purchase. For various reasons – including, for example, a change of station order – borrowers often need financing to pay off the loan on an old car they want to trade in when they purchase a replacement car. Similarly, borrowers often finance items essential to the purchase, such as sales tax and title, registration, and delivery fees. If servicemembers could not finance these items, it could render the purchase of a replacement vehicle unaffordable for many, particularly if financing is needed to pay off the loan for the trade-in vehicle.

## IV.    Interpretive Guidance Does Not Affect the Analysis.

Appellant relies on interpretive rules adopted by DoD in 2016 and 2017. The 2017 Guidance asserted that the presence of GAP would remove a loan from the auto loan exemption. But DoD withdrew that guidance in 2020. Appellant argued, and the district court assumed, that if the 2017 Guidance were still standing it would determine whether the RIC falls within the MLA. That is incorrect. Interpretive rules are merely guidance and are not entitled to deference if they are

unpersuasive or contradict the statute.  The 2017 Guidance is entitled to no

deference because it is foreclosed by the statute's plain language.

### A.    Interpretive Rules May be Disregarded and Given No Weight.

Under the Administrative Procedure Act, 5 U.S.C. § 553(a)-(c), "legislative

rules" adopted within an agency's statutory authority have the "force and effect of

law" and they must be issued through a notice and comment process.  *Children's

Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 619, 620 (4th Cir.

2018).

The 2016 Guidance and the 2017 Guidance are merely "interpretive rules."

They were not adopted through the notice and comment process.  Interpretive rules

do not have the force and effect of law.

Although legislative rules create new law or impose new rights or duties,

interpretive rules provide the agency's interpretation of what the statute means and

"only 'remind' affected parties of existing duties."  *Jerri's Ceramic Arts, Inc. v.

Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989).  "Put

differently, '[a]n interpretive rule is merely a clarification or explanation of

an existing statute or rule.'"  *Azar*, 896 F.3d at 620 (emphasis in original) (quoting

*Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995)).

Interpretive rules are not given the full "controlling weight" that legislative

rules receive under *Chevron* deference.  *Walton v. Greenbrier Ford, Inc.*, 370 F.3d

446, 452 (4th Cir. 2004). Rather, interpretive rules are entitled to the more limited

deference provided in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Carlton &*

*Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 264-65 (4th Cir.

2020).

Under *Skidmore*, the weight given to interpretive rules "depend[s] upon the

thoroughness evident in [the agency's] consideration, the validity of [the agency's]

reasoning, its consistency with earlier and later pronouncements, and all those

factors which give it the power to persuade." *U.S. Dep't of Lab. v. N. Carolina*

*Growers Ass'n*, 377 F.3d 345, 354 (4th Cir. 2004) (determining that agency's

interpretation of Fair Labor Standards Act lacked statutory support and persuasive

power). In other words, an interpretive rule is entitled to respect only if it has the

power to persuade. *PDR*, 982 F.3d at 264-65. When determining a rule's

persuasiveness, courts consider "the degree of the agency's care, its

consistency, formality, and relative expertness, and [] the persuasiveness of the

agency's position." (*Id.*); *see also Mining Energy, Inc. v. Dir., Off. Of Workers'*

*Comp. Programs*, 391 F.3d 571, 574, n.1 (4th Cir. 2004) (an agency's

interpretation is given "considerably less deference" if it has taken contradictory

positions).

This Court has sometimes given "great respect" to persuasive interpretive

rules, but it has also shown "near indifference" to unpersuasive interpretations.

*PDR*, 982 F.3d at 265.  For instance, it has consistently declined to give *Skidmore*

deference to an agency interpretation where the interpretation was foreclosed by

the "plain language of the statute."  *Nahigian v. Juno-*

*Loudoun, LLC*, 677 F.3d 579, 587 (4th Cir. 2012).  And this Court has concluded

that an agency's interpretation of regulations was unpersuasive, and not entitled to

*Skidmore* deference, when it was a "stark departure, without notice, from long-

used practice and thereby cannot be deemed consistent with earlier and later

pronouncements."  *Romero v. Barr*, 937 F.3d 282, 297 (4th Cir. 2019).

Additionally, an interpretation that is "completely devoid of any statutory analysis"

and lacks any "effort made to explain or justify" an agency's position does not

warrant *Skidmore* deference.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d

635, 645 (4th Cir. 2018).

### B.    DoD is Not an Expert in Financial Matters.

DoD administers and implements the MLA but does not regularly deal with

consumer credit matters.  Its website describes its "mission" as "provid[ing] the

military forces needed to deter war and ensure our nation's security."

https://www.defense.gov/About/ (accessed 3/24/2022).  DoD's lack of expertise in

consumer credit reduces the persuasiveness of any interpretive guidance issued by

DoD on this issue.

### C.    The 2016 Guidance

In 2016, DoD issued an interpretive rule in the format of questions and answers.  The question asks whether extending credit for buying property including a cash advance falls within the MLA personal property loan exemption.  DoD answered that a purchase money loan with cash-out financing does not meet the personal property loan exemption:

> A hybrid purchase money and cash advance loan is not expressly intended to finance the purchase of personal property, because the loan provides additional financing that is unrelated to the purchase. To qualify for the purchase money exception . . .  a loan must finance only the acquisition of personal property.  Any credit transaction that provides purchase money secured financing of personal property along with additional "cash-out" financing is not eligible for the exception under § 232.3(f)(2)(iii) and must comply with the provisions set forth in the MLA regulation.

81 Fed. Reg. 58840-01 at 58841 (emphasis added); Stat.Reg.Add.13.

This interpretive rule is unpersuasive and should be disregarded because it deviates from the statute.  The explanation is cursory and superficial and does not analyze the plain terms of the statute.  Calling a loan a "hybrid loan" has no significance under the MLA.  The MLA does not contemplate picking apart a loan contract and deciding whether each item in the amount financed is for the sole purpose of buying the car.  Rather, the statute grants an exemption when the loan procured in buying the property is for the express purpose of financing the purchase and is secured by the personal property procured.  10 U.S.C. § 987(i)(6).

25

Even if the 2016 Guidance were persuasive, its reasoning does not apply to the auto loan exemption and the items in Appellant's RIC.  Unlike a cash advance that is not necessarily related to the purchase of personal property, the purchase of GAP waiver is inextricably bound with and related to buying a car.  A GAP waiver is not bought separate from a car, as it amends the loan and becomes part of it.  *See* page 17, above.  It is related to the purchase of the car.  The GAP waiver does not fall outside the MLA exemption because it is related to the loan.

### D.     The 2017 Guidance

A DoD interpretive rule adopted in 2017 amending Q&A #2, 82 Fed. Reg. 58739-01 (12/14/2017) (Stat.Reg.Add.14), was withdrawn in 2020, 85 Fed. Reg. 11842-02 (2/28/2020) (Stat.Reg.Add.17).  Thus, the 2017 Guidance has no persuasive value and should be given no deference.

And the 2017 Guidance is unpersuasive because, like the 2016 Guidance, it does not apply the plain terms of the statute, and it draws distinctions that are not rooted in the statutory language.  The 2017 Guidance stated:

> [A] credit transaction that includes financing for [GAP] insurance or a credit insurance premium would not qualify for the exception . . . . Similarly, a hybrid purchase money and cash advance credit transaction is not expressly intended to finance the purchase of a motor vehicle or personal property because the credit transaction provides additional financing that is unrelated to the purchase.

82 Fed. Reg. 58739-01 at 58740 (emphasis added); Stat.Reg.Add.16.

First, this guidance is unpersuasive because it does not consider the plain words of the statute to see if the loan is "for the express purpose of financing the purchase." 10 U.S.C. § 987(i)(6). Second, this guidance draws distinctions without statutory or regulatory basis to say that GAP and credit insurance are not components of a loan for the express purpose of financing the purchase.

DoD arbitrarily selected some related items that would eliminate the MLA exemption, even though other items would not remove the exemption. In those examples, GAP and credit insurance are "related to" the auto purchase, just as an extended service contract or negative equity. They are not "unrelated to" the purchase. But DoD did not analyze or explain – nor could it explain how – GAP and credit insurance are "unrelated to" the purchase.

In this case, the district court properly declined to rely on the 2017 Guidance because it was withdrawn. Moreover, the 2017 Guidance was not a long-standing interpretation; it surprised the industry, upending the long-held understanding of the MLA and precluding servicemembers from having available to them protections afforded to civilians. DoD's position violates the industry standard of offering an optional GAP waiver, which the consumer may choose to buy when signing the loan.

## **CONCLUSION**

For all the foregoing reasons, the district court's judgment of dismissal

should be affirmed.

Dated:  March 24, 2022.

Respectfully Submitted,

s/ Marci V. Kawski
Marci V. Kawski
HUSCH BLACKWELL LLP
P.O. Box 1379
33 East Main Street, Suite 300
Madison, WI 53701-1379
608-255-4440
608-258-7138 (fax)
marci.kawski@huschblackwell.com

s/ Lisa M. Lawless
Lisa M. Lawless
HUSCH BLACKWELL LLP
511 North Broadway, Suite 1100
Milwaukee, WI 53202-5502
414-273-2100
414-223-5000 (fax)
lisa.lawless@huschblackwell.com

Attorneys for *Amici Curiae* the American Financial Services Association, Consumer Bankers Association, Guaranteed Asset Protection Alliance, National Automobile Dealers Association, Consumer Credit Industry Association, and Chamber of Commerce of the United States of America

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because this brief contains 6,084 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  March 24, 2022.

s/ Lisa M. Lawless

LISA M. LAWLESS

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2022, the foregoing brief was served on all parties or their counsel of record through the CM/ECF system.


Dated:  March 24, 2022.

s/ Lisa M. Lawless

LISA M. LAWLESS

## **ADDENDUM**

**Local Rule 26.1 Disclosure Statements**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-1697__      Caption: __Davidson v. United Auto Credit Corporation__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__American Financial Services Association__
(name of party/amicus)

_____

 who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☐NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _s/ Lisa M. Lawless_____     Date: ___March 24, 2022___

Counsel for: _American Financial Services Assoc.___

- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1697        Caption: Davidson v. United Auto Credit Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Consumer Bankers Association
(name of party/amicus)

who is _____ amicus curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Lisa M. Lawless          Date: ____March 24, 2022____

Counsel for: Consumer Bankers Association

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1697          Caption: Davidson v. United Auto Credit Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Guaranteed Asset Protection Alliance
(name of party/amicus)

who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                              ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Lisa M. Lawless                    Date:    March 24, 2022

Counsel for: Guaranteed Asset ProtectionAlliance

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1697        Caption: Davidson v. United Auto Credit Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

National Automobile Dealers Association
(name of party/amicus)

who is _____ amicus curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                              ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Lisa M. Lawless                        Date:    March 24, 2022

Counsel for: National Automobile Dealers Assoc.

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 21-1697          Caption: Davidson v. United Auto Credit Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Consumer Credit Industry Association
(name of party/amicus)


who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:  s/ Lisa M. Lawless                          Date:      March 24, 2022

Counsel for:  Consumer Credit Industry Assoc.

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1697          Caption: Davidson v. United Auto Credit Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Chamber of Commerce of the United States of America

(name of party/amicus)

who is          amicus curiae          , makes the following disclosure:

(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Lisa M. Lawless                     Date:      March 24, 2022

Counsel for: Chamber of Commerce of the USA

- 2 -

Print to PDF for Filing